IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| JARED WILLIAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 2:21-cv-02977-DCN |
| vs. | ) | |
| | ) | **ORDER** |
| HOMEOWNERS OF AMERICA | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This matter is before the court on plaintiff Jared Williams's ("Williams") motion for summary judgment, ECF No. 26, and defendant Homeowners of America Insurance Company's ("HOAIC") motion for summary judgment, ECF No. 27. For the reasons set forth below, the court denies Williams's motion and grants HOAIC's motion.

## I.  BACKGROUND

This insurance dispute arises out of a homeowner's insurance policy (the "Policy") between an insurer, HOAIC, and its insured, Williams, covering Williams's residence located at 740 Magnolia Road, Charleston, South Carolina (the "Residence"). It is largely undisputed that the Residence is located north on Magnolia Road in relation to the Magnolia Park and Community Gardens and the Schoolhouse, a commercial building. When it rains, water accumulates in the Schoolhouse's parking lot. That water flows into a storm drainage trench that runs through the Magnolia Park and Community Gardens and up Magnolia Road. The trench is intended to funnel water to end of the storm ditch, located across the street—and approximately fifty feet away—from the Residence. However, the storm drain is often ineffective, causing water to overflow onto

1

Williams's Residence.  The City of Charleston and the South Carolina Department of

Transportation ("SCDOT") maintain the storm drain and have purportedly made multiple

attempts to repair the storm drain, to no avail.

On July 8, 2021, Tropical Storm Elsa passed through Charleston, depositing

approximately two to four inches of rain in the area surrounding the Residence over a

twenty-four-hour period.  The storm drain on Magnolia Road failed to handle the volume

of water, and after the water exceeded the drain's capacity, it flowed onto Williams's

property.  Eventually, the water inundated the entire lot of the Residence and entered the

interior.  On July 10, 2021, Williams filed a claim with HOAIC for the rainwater damage

to the Residence.  After reviewing Williams's claim and sending an independent field

adjuster to the Residence, HOAIC denied Williams's claim by letter dated July 22, 2021,

reasoning that "[t]he cause of the water intrusion was due to flood waters from heavy

rains," and the "policy does not provide coverage for flood, surface, [or] overflow of any

body of water."  ECF No. 28-21 at 1.

The denial letter referred to an "Exclusions" section in the Policy, which states in

relevant part:

> **A.** We do not insure for loss caused directly or indirectly by any of the
> following.  Such loss is excluded regardless of any other cause or event
> contributing concurrently or in any sequence to the loss.  These
> exclusions apply whether or not the loss event results in widespread
> damage or affects a substantial area.
>
> . . .
>
> **3. Water**
>
> This means:
>
> > **a.** Flood, surface water, waves, including tidal wave and tsunami,
> > tides, tidal water, overflow of any body of water, or spray from

2

any of these, all whether or not driven by wind, including storm surge;

    **b.**  Water which:
        (1) Backs up through sewers or drains; or
        (2) Overflows or is otherwise discharged from a sump, sump
            pump or related equipment

. . .

This Exclusion **A.3.** applies regardless of whether any of the above, in **A.3.a.** through **A.3.d.**, is caused by an act of nature or is otherwise caused. This Exclusion **A.3.** applies to, but is not limited to, escape, overflow or discharge, for any reason, of water or waterborne material from a dam, levee, seawall or any other boundary or containment system.
However, direct loss by fire, explosion or theft resulting from any of the above, in **A.3.a** through **A.3.d.**, is covered.

ECF No. 26-2 at 1–2.

On July 30, 2021, Williams filed a complaint against HOAIC in the Charleston County Court of Common Pleas, alleging (1) breach of contract, (2) breach of contract accompanied by fraud and/or misrepresentation, and (3) bad faith. ECF No. 1-1, Compl. On September 15, 2021, HOAIC removed the action to this court. ECF No. 1.

On May 12, 2022, Williams filed his motion for summary judgment. ECF No. 26. HOAIC responded to the motion on May 26, 2022, ECF No. 30, and Williams replied on May 27, 2022, ECF No. 31. On May 13, 2022, HOAIC filed its motion for summary judgment. ECF No. 27. Williams responded in opposition on May 27, 2022, ECF No. 31, and HOAIC replied on June 3, 2022, ECF No. 32. On July 7, 2022, the court held a hearing on the motions. ECF No. 35. As such, both motions have been fully briefed and are now ripe for review.

## II.  STANDARD

Summary judgment shall be granted if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any

3

material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56(c).  "By its very terms, this standard provides that the mere existence of some

alleged factual dispute between the parties will not defeat an otherwise properly

supported motion for summary judgment; the requirement is that there be no genuine

issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).

"Only disputes over facts that might affect the outcome of the suit under the governing

law will properly preclude the entry of summary judgment."  Id. at 248.  "[S]ummary

judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."

Id.  "[A]t the summary judgment stage the judge's function is not himself to weigh the

evidence and determine the truth of the matter but to determine whether there is a

genuine issue for trial."  Id. at 249.  The court should view the evidence in the light most

favorable to the non-moving party and draw all inferences in its favor.  Id. at 255.

### III.   DISCUSSION

Williams and HOAIC submit competing motions for summary judgment.  Both

motions contest whether the damage to the Residence resulted from "surface water" or

"flood water" such that the damage is insured under the Policy.  Specifically, Williams

argues that the water that entered the Residence was neither "surface water" nor "flood

water," while HOAIC argues that both exclusions are applicable.[1]  Additionally, HOAIC

---

[1] In its motion for summary judgment, HOAIC predicts that Williams would argue that one of the Exceptions to the Exclusions applies.  Specifically, HOAIC notes that one of the exceptions to "Exclusion A.3. Water" states that "Paragraphs a. and c. that apply to surface water and water below the surface of the ground do not apply to loss by water covered under c.(5) and (6) above."  ECF No. 28-1 at 28.  Paragraphs c.(5) and (6) stated, in turn, that "Unless the loss is otherwise excluded, we cover loss to property covered under Coverage A or B resulting from an accidental discharge or overflow of

4

argues that the anti-concurrent causation clause in the Exclusion section further excludes coverage.  Finally, HOAIC argues that Williams submitted no evidence of bad faith. Since the parties' motions focus on the same issues, the court addresses the motions together under each issue.

### A.  Surface or Flood Water

To determine whether the Policy provides coverage for the losses incurred by Williams as a result of the rainwater, the court must decide whether the losses were caused by a type of water damage that is excluded from the Policy.  Such losses include those resulting from, inter alia, "[f]lood [or] surface water."  ECF No. 26-2 at 1.

"An insurance policy is a contract between the insured and the insurance company, and the terms of the policy are to be construed according to contract law." Auto Owners Ins. Co. v. Rollison, 663 S.E.2d 484, 487 (S.C. 2008).  "The cardinal rule of contract interpretation is to ascertain and give legal effect to the parties' intentions as determined by the contract language."  Beaufort Cnty. Sch. Dist. v. United Nat'l Ins. Co., 709 S.E.2d 85, 90 (S.C. Ct. App. 2011) (citing Schulmeyer v. State Farm Fire & Cas. Co., 579 S.E.2d 132, 134 (S.C. 2003)).  "If the contract's language is clear and unambiguous, the language alone, understood in its plain, ordinary, and popular sense, determines the contract's force and effect."  Id. (citing Schulmeyer, 579 S.E.2d at 134). However, an insurance contract which is "in any respect ambiguous or capable of two

---

water or steam from within a . . . (i) Storm drain, or water, steam or sewer pipe, off the 'residence premises.'"  Id.  HOAIC proceeds to argue that this exception had specifically been removed by an Endorsement to the Policy.  However, Williams never cites the exception or argues that it applies in any of his briefs, and, therefore, the court need not consider the argument.

meanings" must be construed strictly against its drafter, the insurer. <u>Reynolds v. Wabash Life Ins. Co.</u>, 161 S.E.2d 168, 169 (S.C. 1968).

Williams argues that the Policy is ambiguous, at best, because the terms "surface water" and "flood water" are not defined in the Policy. In the absence of any definitions in the Policy, Williams contends that the court may look to a decision issued by the South Carolina Supreme Court, which ruled that the terms do not apply in situations like the one presented here. While HOAIC acknowledges that the terms are undefined in the Policy, it argues that there is no ambiguity in the meaning of terms as reflected in the very same South Carolina Supreme Court case.

That South Carolina Supreme Court case at the center of this dispute is <u>M & M Corp. of South Carolina v. Auto-Owners Insurance Co. ("M&M Corp.")</u>, 701 S.E.2d 33 (S.C. 2010). In <u>M&M Corp.</u>, the plaintiff sued its insurer after its hotel suffered significant water damage as a result of rainwater exiting an incomplete drainage system. Specifically, the drainage system was incomplete such that water would terminate at an exposed, above-ground pipe, and on the day at issue, the water discharged from the pipe pooled in the hotel parking lot and eventually entered the hotel building. The plaintiff filed an action to recover for the water damage under the Policy. The defendant denied coverage, citing surface water and flood exclusions in its policy that were similar to the ones at issue here. Like here, the terms were not defined in the policy, so the district court determined that the issue turned on the definitions of "surface water" and "flood" in the context of the policy and certified the following questions to the South Carolina Supreme Court:

I.      Under an all-risk Commercial Property Policy of insurance, does "surface water" encompass rainwater collected and channeled in a stormwater collection system?

II.     If the answer to Question I is no, can such non-surface water reacquire its classification as surface water upon exit from the stormwater collection system and, if so, under what circumstances?

III.    Under an all-risk Commercial Property Policy of insurance, does "flood water" encompass water discharged from a stormwater collection system in concentrated form, pooled, and that thereafter enters a building?

Id. at 34–35.

The South Carolina Supreme Court answered each question in the negative. Id. at 36. According to Williams, the Court's decision firmly supports his position that the terms do not apply to the rainwater accumulation at issue here. HOAIC disagrees, arguing that unlike in M&M Corp., the rainwater here was never channeled into the storm drainage system; rather, it merely accumulated over the drain until it overflowed. In his reply, Williams argues that this distinction is inconsequential under the definitions established by the Court.

Upon review, the court finds that while the circumstances in M&M Corp. were indeed distinguishable, the State Supreme Court sufficiently dissected the terms "surface water" and "flood water" such that this court can resolve the issue before it. For the reasons set forth below, the court concludes that while the losses were not caused by "surface water," they were caused by "flood water."

Beginning with the term "surface water," South Carolina defines surface water as

waters of a casual and vagrant character, which ooze through the soil or diffuse or squander themselves over the surface, following no definite course. They are waters which, though customarily and naturally flowing in a known direction and course, have nevertheless no banks or channels in the soil, and include waters which are diffused over the surface of the ground, and which are derived from rains and melting snows . . . .

7

Id. at 35 (quoting Lawton v. S. Bound R.R. Co., 39 S.E. 752, 753 (S.C. 1901)).  In M&M Corp., it was uncontroverted that despite the unfinished nature of the drainage system, the rainwater was channeled into the drainage system before it was eventually cast out of an exposed pipe and onto the plaintiff's property.  Accordingly, the court wrote:

> While the water at issue was surface water before it was collected in the stormwater system, it then was concentrated and cast onto Plaintiff's property.  Once surface water is deliberately contained, concentrated, and cast onto an adjoining landowner's property, it is no longer naturally flowing, diffuse water.  Water spewing in an unnatural concentration from a stormwater drainage system lacks the identifiable characteristics of surface water the court approved in Lawton.

Id. (emphasis added).  HOAIC argues that unlike in M&M Corp., here, the rainwater was never concentrated or channeled into the drain and was not cast onto Williams's property.  Instead, the water accumulated over the drain before overflowing.  While it is certainly true that the water never entered the drain system and was never expelled by an artificial source, such as a pipe, it nevertheless remains true that "[t]he water intruding upon [Williams's] property was not owing to fortuitous natural causes, but instead to the deliberate actions of another."  Id.  HOAIC does not meaningfully dispute Williams's account that the trench running from the Schoolhouse to the drain was a man-made, concrete inlet, and the court finds that the evidence supports that finding.  See ECF No. 26-10 at 16–17 (depicting drainage ditch).  As such, the water that entered the Premises could no longer be categorized as water that accumulated due to a natural flow.  Instead, it was "deliberately contained, concentrated, and cast" onto the Premises, even if the concentration was the result of a concrete drain and not via a pipe or similar construct.  Id.  Another court in this district, analyzing M&M Corp., reached a similar conclusion, finding that water that flowed through swales that "were man-made for the purpose of directing water toward a central location" could no longer be considered surface water.

See Remick v. Travelers Home & Marine Ins. Co., 2022 WL 801871, at *4 (D.S.C. Feb. 24, 2022).  The court reasoned that the water flowing through the swales "was clearly no longer diffused over the surface of the ground but was instead being purposefully directed toward Plaintiffs' home."  Id.  Similarly, here, the rainwater was directed toward Williams's property through a man-made trench, and the accumulation would not have occurred but for the trench.[2]  As such, the court finds that the term "surface water," as used in the policy and as defined in M&M Corp., is unambiguous, and Williams's losses were not caused by damages resulting from "surface water."

The South Carolina Supreme Court, under the second certified question, further explained that water does not return to being surface water after it exits a water collection system.  M&M Corp., 701 S.E.2d at 36.  HOAIC's entire argument is premised on the notion that the rainwater never exited the drainage system, so this clarification from the Court is inapplicable here.

While the water that entered the Residence may not have been "surface water," the court finds that M&M Corp. establishes as a matter of law that they constituted "flood waters."  In M&M Corp., the court determined, under the third certified question, that the water at issue was not flood water "because it did not breach containment, but instead it was deliberately channeled and cast upon Plaintiff's land."  Id.  The court finds that the situation here is distinguishable from M&M Corp as it relates to "flood waters," and those distinctions compel an opposite result.  As the Court in M&M Corp. explained,

---

[2] HOAIC cites cases from the Middle District of Pennsylvania, Eleventh Circuit, and Sixth Circuit to support the notion that rainfall that accumulates outside of a building is considered surface water.  However, none of these cases analyzed South Carolina law, and they are therefore inapplicable.  See ECF No. 28 at 14–15.

South Carolina courts have not directly defined "flood water," but in general, "[f]lood waters are those waters that breach their containment, either as a result of a natural phenomenon or a failure in a man-made system." Id. (citing Milbert v. Carl Carbon, Inc., 406 P.2d 113, 117 (Idaho 1965)) (emphasis added). As such, the occurrence of flood waters requires "an element of fortuitousness," such as "an abnormal rising of the waters." Id. (citing Long Motor Lines v. Home Fire & Marine Ins. Co. of Cal., 67 S.E.2d 512, 515 (S.C. 1951)). At least one other court in this district has ruled that the M&M Corp. definition of "flood" is now the operative definition in South Carolina. See Morris v. Auto-Owners Ins. Co., 2016 WL 7473430, at *5 (D.S.C. Dec. 29, 2016) (finding that because the waters in that case "fit precisely into the definition of flood waters that is provided by M&M Corp. . . . , there is no ambiguity in the term 'flood'").

Here, both parties dedicate substantially less of their briefs to arguing whether the waters were flood waters, with Williams even remarking that between the two, HOAIC has a relatively better basis for denial under the surface water provision rather than the flood water provision. The court considers that conclusion erroneous. In his limited argument on the issue, Williams argues that the term "flood waters" does not apply because for it to apply, there must be a preexisting body of water—such as a lake or river—where containment is broken. M&M Corp.'s definition of "flood," however, did not specify that the breach of containment had to occur in such bodies of water. Rather, the court stated that the breach in containment must be the "result of a natural phenomenon or a failure in a man-made system, such as a levee or a dam." M&M Corp., 701 S.E.2d at 36 (emphasis added). Williams's argument is further unsupported by decisions from other courts that have considered the definition. In Remick, the plaintiffs

contended that water had failed to drain off the streets as designed, collected on a higher-elevation street, and flowed down toward their home. 2022 WL 801871, at *1. Although the court denied summary judgment on the issue of whether the water at issue constituted flood water, it only did so because there were genuine issues of material fact as to whether the water had overflowed either a catch basin or sediment pond on the way to entering the plaintiffs' home. Id. at *4. The court explained that if the evidence ultimately showed that water from either of those sources contributed to the water that entered the plaintiffs' home, the "water would properly be considered flood water and excluded under the Policy." Id. Here, neither side disputes that the rainwater entered the home because of an overaccumulation above the storm drain. While the court's analysis in Remick amounts to dicta, it suggests that overflow from a catch basin amounts to a breach of containment, rather than a conveyance, such that the overflow is properly considered flood water. In another case, the court agreed with the defendant that damages resulting from rainwater that seeped into gas pumps and underground storage tanks was caused by flood waters, further undermining Williams's arguments that flooding can only occur to bodies of waters like lakes or rivers. Monticello Rd., LLC v. Auto-Owners Ins., 2018 WL 3109817, at *2 (D.S.C. June 25, 2018).

The fact that the trench and storm drain were man-made does not alter this court's finding. The M&M Corp. definition specifies that flood waters may be the result of a failure in a man-made system. The more critical factor is that the drain was intended to contain the water, meaning that the damages were a result of a breach in containment, rather than water that was deliberately channeled. Additionally, the occurrence meets M&M Corp.'s requirement that the flood waters be fortuitous or abnormal. Williams's

own evidence suggests that the City of Charleston has purportedly tried to fix the drain by water blasting it "a couple of times."  ECF No. 26-5, Reeder Aff. ¶ 8.  It was thus the City of Charleston's (presumably) unintended failure to contain the rainwater that led to the overaccumulation and the resulting damage.  In sum, these waters fit into the definition of flood waters as provided by M&M Corp.  There is no ambiguity in the term,[3] and the Policy expressly excludes coverage for water damage caused by the occurrence.  The court thus finds that summary judgment is warranted in HOAIC's favor on Williams's two breach of contract claims.

### B.  Anti-Concurrent Causation Clause

Additionally, HOAIC argues that the Policy's Exclusions section contains an "Anti-Concurrent Causation" clause that excludes coverage for any cause that may have contributed to water damage.  Specifically, the provision states: "Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss."  ECF No. 26-2 at 1.  South Carolina recognizes the enforceability of anti-concurrent causation clauses.  See S.C. Farm Bureau Mut. Ins. Co. v. Durham, 671 S.E.2d 610, 613 (S.C. 2009).

However, the clause is not applicable here.  HOAIC has drawn it as a shield when no sword was raised.  Williams does not contend that there were any other independent causes of the water damage to his Residence beyond the rainwater that he claims was

---

[3] In further support of its position, HOAIC argues that its third-party adjuster investigated the damages and concluded that the damages were the result of flood waters. However, since the term, as used in the policy, is unambiguous in light of M&M Corp., such extrinsic evidence does not weigh upon whether the damages were, in fact, the result of "flood waters."  See Watson v. Underwood, 756 S.E.2d 155, 161 (S.C. Ct. App. 2014) ("If a contract is unambiguous, extrinsic evidence cannot be used to give the contract a meaning different from that indicated by its plain terms.").

channeled into his building.  Instead, Williams argues that his damages are covered because there was no surface or flood water involved at all.  Since Williams does not contend that there was a concurring factor that caused the damages at issue, this clause does not provide an alternative reason to grant summary judgment in HOAIC's favor.

### C.  Bad Faith

Finally, HOAIC argues that summary judgment is warranted in its favor on Williams's bad faith claim.  Williams responds in his brief that regardless of the outcome on the breach of contract claim, the court should allow the bad faith claim to proceed with discovery because the parties stipulated to the bifurcation of the issues in the Rule 26(f) report.  However, at the hearing, Williams conceded that if the court finds that the occurrence was the result of surface or flood water, he would have no valid bad faith claim.  Since the court concludes that Williams's damages are not covered under the Policy, it finds that Williams's bad faith claim fails as a matter of law.

Even if the court were to look beyond Williams's concession, the court would reach the same conclusion.  The elements of bad faith refusal to pay are: "(1) the existence of a mutually binding contract of insurance between the plaintiff and the defendant; (2) refusal by the insurer to pay benefits due under the contract; (3) resulting from the insurer's bad faith or unreasonable action in breach of an implied covenant of good faith and fair dealing arising on the contract; (4) causing damage to the insured."  Crossley v. State Farm Bureau Cas. Ins. Co., 415 S.E.2d 393, 396–97 (S.C. 1992) (citation omitted).  "If there is a reasonable ground for contesting a claim, there is no bad faith."  Id. at 397.  An insurer has on objectively reasonable ground when that insurer "clearly did not improperly contest coverage, nor did [it] act in willful, wanton, or

reckless disregard of [the insured's] rights under the Policy." Shiftlet v. Allstate Ins. Co., 451 F. Supp. 2d 763, 770 (D.S.C. 2006). "When conflicting evidence is presented, summary judgment on the issue of bad faith is generally inappropriate." Id. (citation omitted). However, summary judgment is appropriate where the insurer can prove that its actions were reasonable based "on all the evidence available in the case." Snyder v. State Farm Mut. Auto Ins. Co., 586 F. Supp. 2d 453, 460 (D.S.C. 2008).

Courts applying South Carolina law have granted motions for summary judgment by finding no bad faith where the court was able to identify a reasonable basis for an insurer's decision. See Remick, 2022 WL 801871, at *5 (holding that there was no bad faith in denying coverage when there was an objectively reasonable basis for the decision); BMW of N. Am., LLC v. Complete Auto Recon Servs., Inc., 731 S.E.2d 902, 907 (S.C. Ct. App. 2012) (same); Shiftlet, 451 F. Supp. 2d at 772 (same). This is particularly so where the court's reasoning mirrors the reason initially cited by the insurance company. See Dan Ryan Builders W. Va., LLC v. Main Street Am. Assurance Co., 452 F. Supp. 3d 411, 427 (D.S.C. 2020) ("Based on . . . the lengthy analysis above, [the insurer] had reasonable grounds for its conclusion that [the plaintiff] was not an additional insured . . . .").

Here, the court finds that HOAIC did not act unreasonably in denying Williams's claim based on the evidence available to it at the time it denied the claim. As discussed above, HOAIC sent an independent field adjuster to investigate the claim. HOAIC also reviewed the evidence submitted by Williams, which, by his own account, amounted to over 100 photographs and twenty-seven videos. ECF No. 31 at 3. HOAIC subsequently decided that the accumulated rainwater was either surface water or flood water under the

Policy.  Williams has not presented any evidence that this determination was motivated by bad faith, nor has he shown any indication that such evidence might exist.  Along with the fact that the court has concluded that Williams's damages were, in fact, the result of surface or flood water, the court finds that HOAIC had an objectively reasonable basis for denying coverage.

## IV.   CONCLUSION

For the reasons set forth above, the court **DENIES** Williams's motion for summary judgment and **GRANTS** HOAIC's motion for summary judgment.

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**August 8, 2022**
**Charleston, South Carolina**

15